Last case of the afternoon is Peeple v. Pacheco. Did I pronounce that correctly or close? You may proceed. May it please the court. Counsel. My name is Jackie Bullard. I am here on behalf of the Office of the State Appellate Defender representing the minor defendant in this case, Maria Pacheco. I intended to restrict my discussion to the ineffective assistance of counsel claims, although I'm more than happy to discuss any of the other claims that are in the briefing. It goes without saying that lawyers are critically important to criminal proceedings, especially when the client is a child. And it also goes without saying that before a lawyer can develop a theory of the case or render constitutionally sufficient representation, that lawyer has to know what the essential elements of the offense are that the client is charged with. In this case, counsel demonstrated that he was unfamiliar with the law of felony murder. He did this in several ways. And he did it in ways that were critically damaging to the fairness of the proceedings because his misunderstanding of the felony murder rule resulted in counsel conceding that his client was guilty of the predicate felony for that particular charge. If the jury found that Maria was guilty of the predicate felony, it was required under the instructions that it received to find her guilty of first-degree murder. In this case... Ms. Barr, I'm not sure, after reading the record, that counsel didn't understand the felony murder rule. You kind of premised your argument, and I noticed in your briefs the same way, that you're assuming he just didn't understand it. But that wasn't apparent to me. I think he understood it. How do you answer the statement that maybe he was just trying to make the best argument he could under terrible facts and a lot of evidence against his client? The response to that is twofold. First of all, there's People v. Chandler, which under analogous circumstances where the trial counsel made concessions in opening and closing statements, not that the client was guilty, but the client was present at the offense, and that the client's confession, which admitted guilt of the underlying felony, was truthful. And that alone led the Supreme Court to believe that trial counsel in that case didn't understand the felony murder rule when there was no legitimate strategy. But in Chandler, the lawyer didn't cross-examine. The lawyer didn't do anything, basically. That's not true in our case. In this particular case, we have one additional fact, and that is at the close of the case when trial counsel files a motion for a new trial, he makes an argument to the trial judge, Maria is not guilty, Maria is guilty of robbery, but she's not guilty of murder. That's not the kind of argument that you make to a trial judge who understands the law. That's true. So the fact that he was maintaining this position even after he was out of the presence of the jury, and presumably thought he had some shot at that argument before the trial judge indicates that he was not sufficiently familiar with the felony murder rule. And in this case, as in Chandler, there were additional errors. The particularly remarkable error, I think, in this case that counsel committed is failure to impeach Jared Riley, who was the principal in this case, the young man who actually killed Maria's uncle, with a variety of incriminating text messages. In this case, Jared testified that his original statement, the state introduced evidence of his original statement, and at trial, Jared added several additional details that made Maria appear much more culpable than in his original statement. And in particular, he adds the fact that when they're in the house, Maria pushes Arnolfo into him. So she becomes an active participant in the attack. He adds that Maria said, remember what he did to me when he pushes Arnolfo into him. He adds now, after initially claiming that Maria was upstairs during the entire attack, he now adds that he felt her presence downstairs. And again, if she's downstairs witnessing this violent attack, it makes her appear much more culpable, much more involved. Doesn't she state when she's interrogated, well, he deserved it? She did say this. I think that it's important to remember that at that particular point in the proceedings, Jared had text messaged her and told her that her uncle was sexually abusing Maria's younger sister, Claudia. So at that point, you have a child who has just turned 16, who has learned from Jared that, through Jared's text messages, that Claudia has just told me that your uncle is, he's been touching you in ways that make you feel uncomfortable. Now, in addition to this touching that makes you feel uncomfortable, Jared has now added fuel to the fire and said, your uncle is molesting your sister, Claudia. And I noted this in my reply brief. The notion that the proposition that an individual thinks that sex offenders should die is not a particularly remarkable proposition. There are states, as recently as 2008, where the majority of legislators in those states thought that sex offenders ought to die. They passed a death penalty in sex offender cases. Sex offenses are extraordinarily emotionally charged. And Maria also then, at trial, said, I know now he was lying to me about that. I know now that he didn't really receive those text messages. But at the time, I hadn't seen the body. I didn't know how violent the attack was. And in my mind, Arnulfo was really a bad person who was hurting someone who was close to me. What defense could have been raised on her behalf? Defaulting counsel for being ineffective. What would have been an effective strategy at trial in this case? Holding the state to its burden of proof and not telling jurors my client is guilty of the underlying felonies. Your client testified at trial, and there were many text messages, thousands between them, that implicated her in the plan to kill her uncle. The response to that, again, is twofold. The first is that in terms of her testimony at trial, her decision to testify at trial was predicated on the advice of an attorney who didn't understand the felony murder rule. If you're an attorney and you don't understand that your client is on the hook for first-degree murder, if there's evidence that she participated in the planning of the underlying felony, if you don't understand that, you don't see a risk to your client testifying. If you understand the felony murder rule, and you know that your client, when she gets on the stand, is going to say, I participated in the planning, the text messages that suggest that are indeed true, the advice that you give that client is very, very different. And this is really this sort of pattern practice, this theme about how counsel's misunderstanding affected the entire proceedings. If you don't understand the felony murder rule, you cannot, as a lawyer, accurately advise your client about whether testifying is a good idea. Would it be reasonable under the circumstances of this case for the lawyer to look at the wealth of evidence in the case and advise his client, look, if you don't testify, we don't have a chance. But if you testify and you get up there and the jury looks at you, you're 16 years old, there's a chance they'll cut you a break on the murder charge. Jury lenity, whatever you want to call it. Under these circumstances, why is that not an appropriate strategy? Because we know that counsel didn't understand the felony murder rule because he maintained his misunderstanding of the felony murder rule even when he was in front of the trial court. And so that's not a reasonable presumption to make when you know that counsel didn't understand the law in those proceedings. My other response would be to return again to Chandler and look at the facts in Chandler. In Chandler, you had an attorney who made a mistake, who misunderstood the law of felony murder, who made concessions that were not even as dramatic as the concessions in this particular case. The attorney in Chandler only conceded the defendant's presence at the scene of the burglary. And the truth of the defendant's... The defendant actually confessed twice. He confessed, then he recanted, and then as soon as the police told him, well, we have evidence you were there, he then affirms his original confession and then adds additional details. The evidence against the defendant in Chandler was really extraordinarily strong. You had evidence that the defendant, by his own admission, entered the house where the burglary took place with the co-defendant. Very much this sort of common design that we're going to go in and commit a burglary. You have the defendant's confession that he saw in his confession. He talks about, I saw my co-defendant go upstairs with a knife. At that point, the Chandler co-defendant didn't walk out of the room, didn't walk away, he stayed. After the victim in Chandler was murdered, the defendant took proceeds himself, took them home, told police that he took those proceeds home, and also directed police to the location of other proceeds. So the reliability of the defendant's confession in Chandler was extraordinarily strong because it was corroborated by these additional confirmed details about the presence of the proceeds. In addition, the defendant's girlfriend testified, went even further and said,  on the day of the murder, the defendant's girlfriend testified that he was the one who killed the victim. I'm not going to argue that the testimony of jailhouse snitches is particularly strong, but you also had two jailhouse snitches who testified that the defendant confessed to them that he had committed the murder. The trial attorney in Chandler was presented with every bit as incriminating evidence, as was present in this case. But the Supreme Court said, and I think this is the lesson of Chandler, that whenever you do a Strickland analysis, there's this notion that you take a look at both prejudice and the severity of the error. And the less severe the error, the more prejudice there has to be. The greater the prejudice has to be from that particular error. What Chandler tells us, that in the case where a defense counsel doesn't understand the law, doesn't understand the felony murder rule, and defense counsel concedes his client's guilt of that underlying felony, and counsel makes other errors in the case, under those circumstances, the prejudicial impact of an error like that is so strong that even when the state's evidence is otherwise sufficient to sustain a conviction, under those circumstances, we can't have confidence in the proceedings. That wasn't a fair proceeding. The job of lawyers is not to concede the guilt of their clients. There are limited circumstances when they can do that, when they are pursuing a legitimate trial strategy, which was the case in all of the cases that the state cited, where defense counsel in those cases may not have been pursuing a brilliant trial strategy, but in those cases you had a defense counsel who was presented with strong evidence against the client, but they either pursued a second degree murder case or a compulsion defense. There was some strategy, some slim hope that there was a defense for those defendants. In this case, defense counsel didn't do any of those things. There was no strategy to conceding that Maria was guilty of the underlying felony. Defense counsel wasn't pursuing a lesser included offense. There was no worry about the death penalty in this case, that sort of conceivably there might have been a reason that he was seeking mercy from the jury. In this case, what counsel could have done is held the state to its burden. When those text messages came in, defense counsel could have argued, they're text messages, they're not face-to-face conversations, you can't get great context from text messages. When it came to Jared Riley's testimony, when he was talking about exactly what those text messages meant, and when he was adding all of these additional incriminating statements and actions from Maria, defense counsel, because Jared had a pretty good explanation for why he had originally downplayed Maria's behavior in the case, and now he was adding these incriminating statements. I was 20 years old, I was in love with her, I was a mope, you know how guys do, I was trying to protect her. That's the kind of reasonable explanation that the jury heard in this case. The text messages, the fact that Jared was claiming at trial that he was besotted with Maria, while at the same time he was text messaging and trying to develop relationships with three different women at the same time, including the last one where he texts Maria, I'm too busy, my phone is dying, and then he turns around and has essentially phone sex or text sex with another woman, completely undermines his explanation and the legitimacy of his explanation for adding all of these additional details. The real explanation, the more reasonable explanation for the addition of all of these incriminating details, is that Jared Riley wasn't a mope, he wasn't beguiled by Maria Pacheco, what he was is he's a bad guy who will say what he needs to say to get what he needs and what he wants. And what did he get, 50 years? He did get 50 years, he got 10 years, he got 10 years under the maximum, and I think that when you look at his plea deal, ultimately you have his confession, you have, he's the killer, so the fact that he has entered an open plea, he's not in really any particular negotiating position at all. At this point, his only hope is to say, well if I throw Maria under the bus, if I make the state's job easier to convict her, and at one point actually in his testimony, when defense counsel asks, isn't your job here to make sure that the state convicts Maria, his answer is yes, he knows exactly why he's there. Right, so counsel did a pretty good job under that cross-examination. But he didn't impeach. I think his cross-examination of Jared Riley was pretty impeaching. Can you spend a little bit of time talking about the constitutionality of the automatic transfer? I can. The Supreme Court in the last several years has done something absolutely extraordinary. What it has said, starting with Roper, where it declared that the death penalty is unconstitutional as applied to all children. And in Graham, where it declared that life without parole is always unconstitutional as applied to children who don't commit homicides. And finally with Miller, where the court said life without parole, even for children who kill, should be extraordinarily rare and should never be imposed automatically. Coupled with that, the Supreme Court in In re J.D.B., J.L.B., said we're going to create a different set of rules in juvenile interrogations when we decide whether a juvenile is in custody or not. What the Supreme Court has said is there are three developmental differences between children and adults, and those three developmental differences mean children are constitutionally entitled to greater protections than adults are under those circumstances. The first is lack of maturity, that children make bad decisions. That's not a surprise to any of us. Thankfully, children don't often stumble across the likes of a Jared Riley, and so their terrible and bad decisions don't have the kind of consequences that occurred in this case. But the court recognized that there is this inherent lack of maturity among children that make them inherently more reckless than adults. The second difference is that children are vulnerable to peer pressure, outside pressure, pressure by adults, in a way that adults are not. And that that susceptibility to pressure from outside sources is coupled with the fact that children, by virtue of their immaturity, have a much more difficult time extracting themselves from horrible situations than an adult would under comparable circumstances. And finally, the court recognized that the character of children simply is not formed. The child that sits before you at 14 or 15 or 16 is not the same person, probably, that you're going to see when that individual is in her 20s or 30s. And so what the Supreme Court did is they, for the first time, outside of the death penalty context, created a categorical approach, adopted the categorical approach for evaluating the constitutionality of statutes when they're applied to children. Previously, under the Eighth Amendment, if you were making an Eighth Amendment challenge to a sentence that didn't involve death, the only question was, was the sentence imposed wildly disproportionate to the offense that was committed? In this case, under the categorical approach, what the court does is it looks at the seriousness of the penalty, and it balances it against the culpability of an entire category of offenders. The other thing... The automatic transfer provision is not punishment. I would concede that that has previously been held. Those holdings predate Miller. Miller and Graham and Roper, none of those held that an automatic transfer provision is punishment. No. The argument that I am making before this court is an extension of Miller. It's sitting that the reasoning in Miller's, that we can't take these extraordinarily harsh adult sentencing procedures, whether it's truth in sentencing, whether it's the automatic application of an adult sentencing range to children. When we look at those statutes, we have to ask ourselves, does the Eighth Amendment require that judges have discretion? Does the Eighth Amendment require that courts have more discretion to depart from those statutes than what they currently have? In this case, I argued in the alternative, even if the transfer decision... I would argue that that transfer decision does implicate the Eighth Amendment because that's where that automatic sentencing range attaches to the child. But even if the Eighth Amendment isn't implicated at the transfer stage, it's absolutely implicated at the sentencing stage when the trial court is required to apply an adult sentencing range at that point. Thank you. You'll have additional time on rebuttal. Ms. Brooks. May it please the court and counsel, my name is Anastasia Brooks and I represent the people in this case. With respect to the issue of effective assistance of counsel, the primary error that the defendant relies on that counsel committed was the equivocal concession of the defendant's guilt that perhaps, is the word the counsel used, that she was guilty of robbery, which was a predicate offense for felony murder. However, the concession of robbery in this case differs from the concession involved in Chandler because here the defendant testified and part of the defendant's testimony included a concession that she had committed the offense of robbery. Counsel, what about counsel's argument that basically the lack of knowledge of the felony murder rule infected all decisions made by counsel and the advice to the defendant? Well, your honor, as the state states in the Massaro case, the direct appeal record is not created specifically to litigate the question of counsel's competency, so therefore it's in many cases not sufficient to permit this court to rule upon the question of whether counsel provided effective representation or not or whether counsel's decisions or failures to act in certain situations had been strategic or whether they lacked strategic justification. In this case, the record does not specifically show enough to demonstrate with any confidence that counsel was in fact ignorant of the law of felony murder. The reference to, in the post-trial motion, that the defendant wasn't proven guilty of murder, well, just because somebody commits a robbery doesn't necessarily mean that felony murder applies in any specific case. There has to be more. But in this case, that's not really the issue because the defendant is admitting when her prejudice analysis that one reason why the concession is so prejudicial because it would be a requirement that the jury had to convict her or any rational jury applying the law in a faithful manner would have to convict her because there was no other argument against felony murder if she had committed the robbery. Would we even be having this argument if the trial court had instructed with the different forms of verdict for the knowing, intentional, and felony murder? Your Honor, I would believe that the instructional issue would make prejudice... If she had committed an intent to kill and that was instructed and that was a separate jury verdict and the jury had so found and there was sufficient evidence to support that or overwhelming evidence to support that verdict, then this whole concession of robbery would not be prejudicial. That would be a much... That would be an impossible case. It's already impossible now. The attorney that the defendant claims is so ineffective made a very effective argument about that issue during the jury instruction conference. He objected. He asked and he even explained to the court why he wanted those different verdict forms. He said, how can the appellate court review, if this case goes up on appeal, how will they be able to review on which count she was found guilty? And it makes a difference. It could make a big difference if it's felony murder versus intentional murder. Right, Your Honor. And the fact is that this court has to give a deference to the counsel's decisions and also has to strongly assume that counsel acted competently and made all these decisions in awareness of the law. And that has to be shown by the defendant. It has to show that to the contrary. That record in this case is just not sufficient for this court to decide that counsel was in fact ignorant of the law. In fact, ignorance of the law wouldn't make any difference because even if the counsel made a decision while being ignorant of the law, this court would have to find that counsel's decision or action that's being challenged was objectively unreasonable. So in other words, the question becomes, what would a competent attorney fully informed of the law have done? And essentially the defendant's argument here now is the only effective strategy is to hold the state to the burden of proof and the counsel defendant not to testify. Well, the defendant's argument, as I said, is premised on Chandler, but Chandler's case where the defendant didn't testify. The defendant didn't testify and admit that he was in the house, which was the subject of the counsel's concession. So if the defendant takes a stand and admits that she committed robbery and the counsel gets on an argument and says, well, maybe she's guilty of robbery, well, is that such an unreasonable thing to do when your client just testified and admitted that? It's not a situation where counsel then, instead of holding the state to the burden of proof where the defendant didn't testify and didn't admit anything in their own testimony during the trial, gets up and then throws the case away by making an admission. That's not the situation. So the defendant then retreats to the claim of, well, counsel gave tainted advice about testifying, tainted by the ignorance that she claims that counsel had. However, there's nothing to show what counsel had, in fact, advised his client to do. So, again, the record is not sufficient to show that counsel gave bad advice to the client about whether to testify or not. It could have been the client who decided, insisted, and pleaded with her attorney to let her, and of course it would be her choice too, to testify. That is the decision which is hers to make. And knowing that, she planned to testify. The counsel then had to plan his defense. And also, counsel cannot ethically counsel her to lie. That's not something an effective attorney is required to do. In fact, the rules of ethics prohibited the attorney from telling his client to tell lies on the stand and perjure herself. So, given that she's made statements, and that her statements are reflected in text messages and in a recorded interview, the counsel was really stuck with overwhelming evidence of guilt. Because she did admit, in the text messages and on video, to police, and in her trial testimony, which she truthfully wanted to give, that's overwhelming evidence of felony murder. So there's no way that she can show prejudice. Even Chandler was a case that refused to presume prejudice under the chronic and hattery line of cases. But Chandler was a case where they did find a reasonable probability of a different result. Well, it's a lot easier to find a reasonable probability and a lot easier to have less confidence in a verdict when a counsel like Chandler does almost absolutely nothing to further his client's case. In fact, anything he does do, which is the concession, damages the case affirmatively. Here, counsel was doing much, much more to aid his client's case. Especially the fact that by having the defendant testify and cross-examining Riley thoroughly, albeit not as to the same great extent that defendant now on appeal claims that he should have done, it's still distinguishable from Chandler and much closer to Shatner, which is very similar factually to the situation where the attempt was to get jury nullification, to show that this defendant who was accused of a horrible crime was brought into a situation, lured into it by someone else, and for that reason the juror should find mercy or not follow the law in convicting. And jury nullification is a legitimate trial strategy, and the record is apparent enough to show that that was in fact what defense was aiming for. Can I ask you one more question about the verdict forms? There was no objection from the state when the defendant first asked for those, and then they changed their mind and objected. Why would the state do that? Do you have any idea? What's the downside to giving specific instructions on that issue? The downside... I do not know exactly what the prosecutor's thinking was on this particular point, but practically speaking the downside is there is one crime of murder in Illinois, and there is not a unanimity requirement between the different counts of murder. So if a few jurors thought it was intent and the rest of the jurors thought felony murder, they could then all agree that there was murder. They don't have to come to a unanimous verdict with respect to each individual count, which could be a more difficult thing in a case where you have 12 people trying to agree on something. So I believe that could be arguably one of the reasons why prosecutors prefer just a simply one verdict form rather than dividing them. I don't want you to run out of time, but I wanted you to address the issue of the constitutionality of the automatic transfer. Yes, Your Honor. Can I make a few more points on effective assistance to make sure I have everything? So essentially, my last point is... I'll get to your point on the next issue, Your Honor. What would a so-called effective strategy have done? Holding the state to the burden of proof is simply just cross-examining Riley, of course, but not having anything to say really about to explain what these text messages meant. By taking a stand, the defendant can then explain, well, that's not really what I meant, or you can't get the context from the text message. So the defendant had to testify to explain that to the extent it wasn't apparent from her interview to the police. So the defense would have been stuck with her interview to the police, and the defense apparently thought they wanted to improve on that by putting her on the stand and tell a better story than what she told the police after her arrest. So it would have guaranteed her conviction. Basically holding the state to the burden of proof in an overwhelming case would have guaranteed conviction. So the errors that she's relying on, none of these errors counsel are alleged were prejudicial. With respect to constitutionality, the Supreme Court cases, which are Roper, Graham, and Miller v. Alabama, the categorical rules have applied only so far in cases where the penalty was either death or life without parole. And life without parole was included along with the categorical rules which applied to the death penalty because in many cases, for a juvenile especially, life without parole can be in some ways worse than death. Somebody who's only 15 who's told that they're going to have to live the rest of their natural life in prison, they said if that's the case, that is essentially as bad as death. The categorical rules, the defense asking this court to be the first court perhaps in the nation to strike down the mandatory minimum penalty for juveniles that is as low as 20 years, albeit with no good conduct credit. And the fact that transfer is not punishment and sentencing consequences only attach upon conviction, really what the defendant's Eighth Amendment and Proportionate Penalty Clause claims is that a mandatory sentence of 20 years in prison with no good conduct credit is unconstitutional according to the defendant. Now, since that penalty in any... there are many cases where that's a valid penalty. So they're not making a facial claim here. They're making an as-applied challenge. And if it's an as-applied challenge, like the Illinois case, the Miller case out of Illinois, which is not Miller v. Alabama, but People v. Miller, that was the case where a minor had only a few minutes to contemplate being a lookout, multiple murders happened, and they said that was unconstitutional in violation of the Illinois Proportionate Penalty Clause. Well, that's getting into the facts of the case. How much culpability did the minor have relative to the severity of the penalty, which was life? Here she's got a 30-year sentence. The mandatory minimum was 20. And, according to the trial court, she was deeply and actively involved and that the murder was vile and utterly senseless. And the text messages she's agreeing, she says yes when Riley talks about killing a bad man. She said the touching ends tomorrow. She said he must be eliminated, referring to the victim. And she also, after Riley said thinking about cutting his throat, which is what you need to do. So she clearly intended on having her uncle die. So it's not a situation where the defendant wants to ignore those facts or discount them. It's not a situation where those facts can be ignored with respect to the constitutionality of her penalty. Because penalties are presumed to be constitutional, statutory penalties, and it's really up to the legislature to decide those penalties within the bounds of the constitution. The defendant has to show a constitutional violation in order to validate a statutory penalty. And with respect to the facts of this case, her youth was taken into account. And she got a much more lenient sentence than, albeit of course Riley was the person who committed the murder. She was only convicted by accountability. But she got much less time than Jared Riley did. And the trial court did take into account her youthfulness as was required. And all four penological goals, which is retribution, deterrence, incapacitation, and rehabilitation were served by this statutory penalty of minimum 20 years no good conduct credit. And so this case is distinguishable from cases like Graham which didn't involve murder, or Miller which involved mandatory life for murder. For those reasons, the state requests this court to affirm. Do you have any other questions? What about the fact that the automatic transfer is what gets the child to the adult court and then subject it to a mandatory adult sentence? The defendant acknowledges that the cases so far on that point are against her in terms of the 8th amendment not applying the transfer issue per se.  But it facilitates the imposition of the punishment. Without the automatic transfer, the child is not subject to that punishment. Under the state's current statutes, you're correct, Your Honor, in the sense that if the juvenile had not been transferred to adult court, the maximum sentence would be up to age 21. Commitment to age 21. And by being transferred to adult court is subject to the unified code penalties, which is 20 to 60. And then the court has no discretion. It must impose at least 20. And it has no discretion about the transfer when the crime is murder and the child is 15 or 16. The statutes as currently written give the court no discretion over the transfer decision and no discretion over the mandatory minimum penalty of 20 years. However, the case that the defendant relies on, Graham, which talks about having schemes that do not take youthfulness at all into account would be flawed. Essentially, youthfulness is taken into account here because judges have a wide range of penalties, 20 to 60 years, for the most serious crime in the state. So that is enough room to give judges discretion to take into account youthfulness. So the scheme itself is not flawed for the reasons that the defendant relies on, which is the citation to this categorical approach adopted by the U.S. Supreme Court. Thank you, Your Honors. Thank you. Ms. Bullard? Can I ask you a question before we get started on this automatic transfer issue? Sure. Is it your contention that automatic transfer in and of itself is unconstitutional because the trial judge has no discretion on which juveniles to transfer? Yes. It's a categorical application. It's an automatic application of a harsh sentencing statute. Is your argument also that the adult sentence is cruel and unusual? I mean, is it your position that the trial judge would have to have discretion to impose probation? In the case of murder, the position is that the automatic application of that sentencing range violates the Eighth Amendment because the Eighth Amendment is applied to juveniles and requires courts to have discretion when it comes to applying harsh sentencing provisions. They do have discretion between 20 and 60, but what they don't have at their disposal is what the court would have had if the case had remained in juvenile court. You may have a judge who thinks under no circumstances does this child belong in adult court. This is a child that if I had the discretion, I would put this child, I would keep this child in juvenile court. Probation for first degree murder for juveniles in juvenile court is not an authorized disposition. For juveniles in juvenile court, they're required to be held in the Department of Juvenile Justice until the age of 21. So as a practical matter, if this court would find that the automatic application at the 20 to 60 range is unconstitutional, the bottom end of that range would be until the minor is 21 years of age, which is the only sentencing option that's available to the trial court. So you would want the court to have discretion in making the decision whether or not to transfer, and then you would also want the court to have discretion as to whether or not to subject the minor to the 20 to 60 range. Yes, Your Honor. If this court agrees that the transfer decision itself implicates the Eighth Amendment, then the remedy is the child gets a transfer hearing. If this court rejects the notion that the Eighth Amendment applies to the transfer decision, then the fallback position is in this automatic application of the sentencing range that constrains a trial court as unconstitutional. But let's say we say that there should be discretion with respect to the transfer decision. Do you still believe that there should be discretion as to whether or not to impose the 20 to 60, or you're saying once you decide to transfer, they're subjected to the 20 to 60, that's not an issue? I think under the current statutory scheme, giving the judge discretion where to try the juvenile. The juvenile has the opportunity for a discretionary transfer hearing at the front end. I do believe that that satisfies the Eighth Amendment. There has to be some discretion somewhere in that arc of proceedings from transfer to sentencing that gives trial courts discretion. I would like to very briefly address your concerns, Justice Pope, about the fact that in Chandler, defense counsel's performance was worse than what occurred in this case. And I think I would agree with that. I would disagree with that just a little bit because what happened in Chandler is the defendant in Chandler argued defense counsel's performance in this case was so bad that it did not qualify for trial to the level of chronic. It was the equivalent of doing nothing at all. And the Supreme Court very specifically rejected that notion. The Supreme Court found defense counsel's performance wasn't so bad that it amounted to no representation. It wasn't so bad that it qualified for chronic. The Court recognized that in this case, they found that trial counsel did some insufficient cross-examination, but acknowledged that with some witnesses, trial counsel did engage in cross-examination. These inquiries are very fact specific, but what Chandler, I keep going back to Chandler, what Chandler says is when trial counsel is under a misapprehension of law and counsel concedes guilt, which is, I can't think of a worse mistake for a lawyer to make than to concede his client's guilt to the jury that's been called there to determine whether the client is guilty or not. So we have a mistake of law that leads to a concession and that's coupled with other trial errors. And in this case, we have other errors. Under those circumstances, it's enough to satisfy Strickland. It's interesting, the Supreme Court's discussion of the prejudice prong in Strickland, they don't really touch on how very strong the evidence was in this case. What they do is they say, this error is so bad. And then if I could quote very briefly, they don't do a detailed analysis of what defense counsel did right and what defense counsel did wrong. Even when presented with a difficult case, counsel must provide reasonably effective assistance to defendant. Counsel failed to do so here. Counsel's defective performance clearly prejudiced the defendant as the jury was forced to convict the defendant of the offense's charge. That's what happened here. The only fact that the Supreme Court points to in Chandler is the fact that the jury was compelled to find a guilty verdict and then there's a sentence after that says the results would have been different. Thanks to both of you for a very good job. Very nice.